UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.                                            **DECISION AND ORDER**
                                                           05-CR-144S

JOHN J. MIKULA,

                    Defendant.

1.      On May 31, 2005, a federal Grand Jury in the Western District of New York charged Defendant John J. Mikula in a two-count Indictment with knowingly being an unlawful user of marijuana in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), and with knowingly, intentionally, and unlawfully possessing marijuana in violation of 21 U.S.C. § 844(a).

2.      Following his arraignment on June 8, 2005, Defendant, who was then incarcerated on state criminal charges, conceded detention, but reserved the right to move for release at a later date.  After being remanded to primary federal custody in October 2005, Defendant moved for release on bond and a hearing was held before United States Magistrate Judge H. Kenneth Schroeder, Jr.  On October 27, 2005, Judge Schroeder ordered that Defendant undergo a psychiatric examination.  A Forensic Mental Health Evaluation was completed and submitted to Judge Schroeder on February 21, 2006.

3.      By written order filed on March 13, 2006, Judge Schroeder concluded that Defendant constituted a danger to members of the community and should be detained pending trial.  Approximately six months later, Defendant moved for reconsideration of the detention Order.  On September 26, 2006, after hearing argument, Judge Schroeder orally granted Defendant's Motion and ordered him released subject to certain conditions.

Currently before this Court is the Government's Motion to Revoke Judge Schroeder's Release Order pursuant to 18 U.S.C. § 3145(a).[1]

4.      Section 3145(a) provides the mechanism by which the Government may seek review of a magistrate judge's release order by a district judge.  See United States v. Harrison, 396 F.3d 1280, 1281 (2d Cir. 2005) (per curiam).  A district court's review of a magistrate judge's order is *de novo*.  See United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985); United States v. Goba, 240 F. Supp. 2d 242, 245 (W.D.N.Y. 2003).

5.      Under the Bail Reform Act, 18 U.S.C. §§ 3141, et seq., pretrial detention is available only pursuant to Section 3142(e).  See 18 U.S.C. § 3142(a)(4); United States v. Dillard, 214 F.3d 88, 90-91 (2d Cir. 2000).  That subsection expressly authorizes the pretrial detention of a defendant upon a judicial finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).

6.      The Government may move for detention in cases that involve certain categories of crimes which are enumerated in 18 U.S.C. § 3142(f).  A recent amendment to this statute permits detention where a defendant is charged with "any felony that is not otherwise a crime of violence that involves . . . the possession or use of a firearm or destructive device."  18 U.S.C. § 3142(f)(1)(E).  If a defendant is charged with such a crime, the court must examine the factors set forth in Section 3142(g) to determine whether any condition or combination of conditions set forth in Section 3142(c) will reasonably assure the defendant's appearance and the safety of other persons and the community.

---

[1] Judge Schroeder's Order of Release is stayed pending resolution of the Government's instant Motion to Revoke.

See 18 U.S.C. §§ 3142(c) and (g); see also United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).

7.  In the instant case, Defendant is charged with being an unlawful user of marijuana in possession of a firearm, a felony which involves possession of a firearm. See 18 U.S.C. § 3142(f)(1)(E).  Consequently, Defendant is subject to pretrial detention under Section 3142(e) if the Government carries its burden of proving that there are no release conditions that can reasonably assure his appearance and protect the community.  See 18 U.S.C. § 3142(f); United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam).

8.  In examining the Government's evidence, a court must weigh the following factors to determine if a defendant's pretrial detention is warranted: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's personal circumstances, including family and community ties, criminal history, any indication of drug and alcohol abuse, and whether at the time of the offense or arrest the defendant was on probation, parole, or conditional release; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  See 18 U.S.C. § 3142(g).

9.  In considering these factors, the court is not bound by the rules of evidence, and may rely on hearsay evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir.1995); Goba, 240 F. Supp. 2d at 247.  To order detention, the court must find that the Government has established a defendant's dangerousness to others and the community

by clear and convincing evidence.[2]  See Ferranti, 66 F.3d at 542.  The Second Circuit has defined clear and convincing evidence as "something more than a 'preponderance of the evidence' and something less than 'beyond a reasonable doubt;'" in other words, evidence that supports a conclusion of dangerousness "with a high degree of certainty."  United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

10.    This Court has thoroughly reviewed the record in this case and has carefully considered the parties' submissions on this motion, along with the Pretrial Service Recommendation which was updated on October 17, 2006.  The following constitute this Court's findings on the relevant factors.

With respect to the first factor, Defendant argues that the offense of unlawful possession of a firearm by a substance abuser is not serious, as evidenced by its treatment under the United States Sentencing Guidelines.  This Court does not agree. While the Guidelines assign a relatively low base offense level of 14 for this crime, U.S.S.G. § 2K2.1(a)(6), Defendant nonetheless faces a statutory maximum of ten years if he is convicted.  See 18 U.S.C. § 924(a)(2).  Moreover, although the facts relating to Defendant's weapons possession **standing alone** may not definitively support a finding of dangerousness, the circumstances under which his possession of those weapons came to light clearly establish that he poses a serious danger to abortion providers, escorts, and others if he is released.

The record reflects that Defendant sent his sister a letter dated June 9, 2004, titled "Last Will and Testament," in which he details the funeral arrangements he would prefer

---

[2] By contrast, the Government need only prove risk of flight by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

4

should he predecease her.  Therein, Defendant indicated that he wanted to be buried with his loaded AT-9 assault rifle (or at least a survival knife) so that he could protect himself "from the evil murderous feminazis in case they try to abort [him] in [his] next life." Defendant's contempt for those who do not support pro-life efforts is clearly expressed in his letter, which states:

> I constantly hope wish and pray that those who don't vote Right to Life in every election die and burn in hell.
> ALWAYS REMEMBER - if you hear that I died accidentally (e.g., on my motorcycle, etc.) - cry.  **If you hear I died in a shootout but was able to kill two or more feminazis and/or their sympathizers (cops, judges, DA[s] or town prosecutors) - then laugh and be happy for me because my mission on Earth will have been a success.**  I will consider it self defense for my next life.

(Gov't Exh. 1) (emphasis added).  Defendant's letter is signed "Sincerely, John J. Mikula - Army of God."   According to the Government, the Army of God is a loosely affiliated network of pro-life individuals whose members have engaged in or advocate violence as a means to end legal abortion.

Concerned about the threatening language of the letter, Defendant's sister contacted the Cheektowaga Police Department.  (Gov't Exh. 3).  In the presence of Cheektowaga Police Officers, she contacted Defendant who told her not to get the police involved or to come over because his house was booby trapped to blow up.  (Gov't Exh. 3).  He also told his sister that he had surveilled abortion clinics and planned to kill some abortion escorts.  (Gov't Exh. 3).  When Defendant was arrested, he had in his possession a document titled "TARG.doc," which contained personal information about local judges, prosecutors, and law enforcement officers, and a local abortion care provider; a computer generated map showing the home addresses of four of the named "TARG.doc" individuals;

5

and a handwritten list titled "Operation Army of God Memorial Day, 2004," which included references to "pipes," "AT- accessories," "timers," "silencer," and "more targets," as well as abortion clinic personnel, and "back of 2500." (Gov't Exh. 6).  Significantly, Womenservices abortion clinic is located at 2500 Main Street in Buffalo, New York.

After Defendant was taken into custody, he admitted to Cheektowaga Police Officers that he had firearms in his house. (Gov't Exh. 3).  A consent search of the house yielded two Rifles -- a Marlin Model 60, .22 caliber, and a Feather Ind AT-9, 9 mm -- one Crossman Air 1008 Pistol, three magazines of AT-9 9mm ammunition, 12 boxes of 7.62 mm ammunition, and one box of 9 mm ammunition.[3]  (Gov't Exh. 3).  According to the Government, agents found marijuana and a marijuana pipe during a subsequent search pursuant to a federal search warrant of Defendant's residence.[4]  This Court finds that the circumstances leading to Defendant's arrest, as well as his history of mental illness, drug abuse, and apparent contempt for authority, discussed more fully below, weigh strongly against his pretrial release.

Second, it appears that there is considerable evidence of Defendant's guilt.  The Government stands prepared to present testimony regarding Defendant's admission that he possessed the weapons which were subsequently found in his home by the Cheektowaga Police Department.  Moreover, Defendant and several of his closest friends have made statements that he has a history of illegal marijuana use.  These statements

---

[3]According to traces conducted by the Bureau of Alcohol, Tobacco and Firearms, Defendant purchased a MAK90 rifle on June 22, 1993, but this particular weapon was not recovered from his home. According to Defendant, this rifle was kept in his parents' home in 1995, but they "turned it over to someone else," and reimbursed Defendant for its cost.

[4]Defendant has moved to suppress all evidence seized in this case on the basis that Defendant's arrest by the Cheektowaga Police Department was unlawful.  This issue has been briefed and is currently under advisement by Judge Schroeder.

are substantiated by the marijuana and drug paraphernalia found in Defendant's home by federal agents. Under the circumstances, this Court finds that the weight of the evidence is against Defendant, and that this factor weighs in favor of his detention.

With respect to the remaining factors, this Court finds that Defendant's personal characteristics and history militate strongly against his pretrial release, and that his release would present a very serious danger to abortion providers, escorts, and others. The record reflects that Defendant is currently unemployed, has a history of mental illness and illegal drug use, is a self-proclaimed affiliate of an extremist pro-life organization that advocates violence, and has criminal convictions for harassment, criminal contempt and stalking. This Court is mindful that Defendant has a supportive family and is intelligent and well-educated. Specifically, Defendant, who is 44-years old, graduated from Rochester Institute of Technology with a bachelor's degree in biology and maintained a steady history of employment for nearly all of his adult life. However, according to the Government, Defendant was laid off and subsequently terminated from his employment as a lab technician in March 2004, because he threatened a co-worker.

In the opinion of this Court, Defendant's current unemployment, and his prior and immediate legal entanglements, are likely a result of his diagnosed personality disorder and his persistent substance abuse. According to his medical reports,[5] Defendant has been psychiatrically evaluated on three separate occasions. In a report dated June 14, 2004, Joseph W. Liebergall, PhD, a licensed psychologist, described Defendant as "an anxious man who obsesses about a variety of issues including abortion, his perceived mistreatment, and the issue of men being treated unfairly, in general." He opined that

---

[5]This Court permitted Defendant to file these reports under seal. (Docket No. 60).

while Defendant does not appear delusional, he nonetheless exhibits "clear obsessive thinking and secondary depression" due to his maladaptive behavior, and has "acted in ways that are alarming to others and suggest that there is at least some question about whether he can maintain control[ ] at various times."

Between July 12, and August 20, 2004, Defendant was evaluated by John M. Wadsworth, a psychiatrist. Dr. Wadsworth reported that Defendant had "developed a personal animosity towards various members of the police, judiciary and others involved in his prosecution," and had even acquired a "map locating their work sites and homes." Describing Defendant as "intense, angry[,] and deeply resentful," Dr. Wadsworth noted that he had never harmed anyone nor intended to do so. Dr. Wadsworth diagnosed Defendant with a personality disorder, not otherwise specified ("NOS"), a condition characterized by "poor judgment, relationship problems, lack of empathy, mildly paranoid thinking, strong irrational judgments and intense anger."

Finally, in a Forensic Mental Health Evaluation rendered on February 14, 2006, Forensic Psychologist Shawn E. Channell diagnosed Defendant with a personality disorder, NOS, which the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition -Text Revision (DSM-IV-TR) defines as "an enduring pattern of inner experience and behavior which begins in adolescence or early childhood, [and] deviates markedly for the expectations of the individual's culture and leads to distress or impairment." Dr. Channell noted that Defendant "experiences feelings of persecution and paranoia, instability of interpersonal relationships, and poor impulse control," and had a history of marijuana and alcohol abuse. Dr. Channell reported Defendant's admission that he had attempted on several occasions to stop using marijuana and alcohol but was unsuccessful.

Defendant's diagnosis is consistent with his self-proclaimed association and apparent obsession with the radical anti-abortion group known as the Army of God and his stated intention to kill abortion escorts. In addition to identifying himself as an Army of God member in his disturbing "Last Will and Testament" and possessing an incriminating list titled "Operation Army of God, Memorial Day,"[6] Defendant also conducted exhaustive research between May 27, and June 6, 2006, on anti-feminism, men's rights, abortion, various right-to-life organizations, including the Army of God, as well as violent convicted criminals and anti-abortion advocates Paul Hill, Eric Rudolph, Loretta Marra, and Dennis Malvasi, militia groups, lock picking methods, weapons, and bomb timers.[7] (Govt Exhs. 5-16). Among the items that federal agents seized from Defendant's home were a galvanized pipe with two end caps, hobby fuses, electrical matches, model rocket engines, smokeless black powder, and the "Anarchists Cookbook." (Gov't Exh. 4, 5 & 6). According to a report rendered by Thomas Mohnal of the Federal Bureau of Investigation's Explosives Unit, the pipe, smokeless powder, model rocket motors, and fuses seized from Defendant's residence could be readily assembled into an improvised explosive device, or pipe bomb. Moreover, the Anarchist's Cookbook, published in 1970, contains recipes and instructions on how to manufacture explosives, among other things.[8] This evidence, taken in its totality,

---

[6]This Court is mindful that Defendant was arrested after Memorial Day, 2004.

[7]Defendant argues, and this Court agrees, that mere interest in a radical organization does not alone support a finding of dangerousness. Rather, in the instant case, it is Defendant's expressed intent to kill abortion escorts and/or providers and his documented, albeit unconsummated plans to achieve this goal that suggests that his obsessive interest in a violent faction of the anti-abortion movement makes him dangerous to others.

[8]Since publication of the Anarchists Cookbook, author William Powell publicly renounced its central message that violence is an acceptable means to bring about social change and requested that it be taken out of print. Mr. Powell's renunciation of his own book appears as a book review on Amazon.com. While the book is still in print, it is illegal in many countries.

suggests that Defendant presents a danger to abortion providers and escorts if he is released.

Defendant also has a criminal record, including convictions for harassment, criminal contempt, and stalking, and has had at least eight Orders of Protection issued against him since 1988. Defendant's prior legal troubles arise almost exclusively from his behavior towards Chandra Schara, a young woman whom he believes is his daughter. According to Defendant, when Chandra was born on March 28, 1988, he was led to believe that she was his daughter, although his name was not put on the birth certificate and his paternity was never established. When Chandra was three years old, Chandra's mother married a man who adopted the girl. The record of the calls made to the Town of Tonawanda Police Department reflect what is appropriately characterized as Defendant's obsession with Chandra and her family over many years. Among other things, Defendant attempted to acquire the girl's immunization records from her school, showed a Ken-Ton school bus driver a picture of Chandra whom he described as his "kidnapped" daughter, appeared on a television story about father's rights which showed a picture of the girl, posted father's rights posters on light poles in the girl's neighborhood, followed the girl and her family while they were trick or treating, threatened Chandra's mother that he would "steal" the girl, and sent a present via "Santa-gram" to the girl's home in violation of a valid stay away order of protection.

Based on the totality of the foregoing circumstances, this Court finds that Defendant's history and characteristics and the grave threat he presents to abortion care providers, escorts and others if released compel pretrial detention in this case. Moreover, given Defendant's persistent mental disorder and his apparent contempt for authority, this Court finds that no condition or combination of conditions will reasonably assure the safety

of these persons and the community. See 18 U.S.C. § 3142(e). Having determined the propriety of Defendant's detention, this Court turns to Defendant's implied argument that the length of his pretrial detention violates his rights under the Due Process Clause, because it has exceeded his potential sentencing exposure.

11.     It is well established that "the due process limit on the duration of preventive detention requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement." United States v. Orena, 986 F.2d 628, 630 (2d Cir. 1993) (quoting United States v. Gonzales Claudio, 806 F.2d 334, 340 (2d Cir. 1986) (internal citations and quotations omitted)).  Therefore, to determine whether the length of pretrial detention has become unconstitutionally excessive, a court must weigh the following factors: (1) the length of detention; (2) the extent of the prosecution's responsibility for delay of trial; (3) the gravity of the charges; and (4) the strength of the evidence upon which detention is predicated. See United States v. El-Hage, 213 F.3d 74, 79 (2d Cir. 2000) (citing United States v. El-Gabrowny, 35 F.3d 63, 65 (2d Cir. 1994)).

With respect to the first factor, this Court finds that the length of Defendant's detention - approximately 13 months in federal custody - is not unconstitutionally excessive. See United States v. Melendez Carrion, 820 F.2d 56, 60-61 (2d Cir. 1987) (on a due process challenge, upholding Defendants' projected pretrial detention period of approximately 32 months). Moreover, where a defendant has been determined to present a danger to the community, courts are less likely to prescribe a strict limitation on the length of his or her detention. See United States v. Millan, 4 F.3d 1038, 1044 (2d Cir.

1998) (finding that the defendants' prospective detention of 30 months, including their detention following a mistrial, did not violate the Due Process Clause where, among other things, the defendants were deemed to be a danger to the community); see also Orena, 986 F.2d at 631 (reasoning that "the constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight," because "[i]n the former case, release risks injury to others, while in the latter case, release risks only loss of conviction").

Defendant argues that his pretrial detention is lengthy in relation to his sentencing exposure under the United States Sentencing Guidelines, which he calculates to be a period of incarceration between 0 and 6 months. As an initial matter, this Court notes that under Second Circuit case law, a defendant's sentencing exposure is not an enumerated factor to be considered in determining whether his or her detention is unconstitutionally excessive.[9] However, even if Defendant's sentencing exposure were an appropriate due process consideration, this Court declines to accept his sentencing calculation, because it is predicated on the following premature or potentially erroneous assumptions.

First, in calculating his exposure, Defendant has reduced his offense level downward two levels based on the assumption that the Government will give him credit for acceptance of responsibility. There being no plea agreement in this case, Defendant has failed to demonstrate that the Government would give him the benefit of such a reduction. Second, Defendant assumes that at sentencing he will be able to prove that he possessed

---

[9] Notwithstanding this fact, in most cases, a defendant's sentencing exposure does accurately reflect the gravity of the charges against him, which – unlike sentencing exposure – is an enumerated factor to be considered in determining whether a defendant's pretrial detention violates due process.

the guns "solely for lawful sporting purposes and collection," and is therefore entitled to a 6- or 8-level downward adjustment pursuant to U.S.S.G. § 2K2.1(b)(2). Given the circumstances leading to Defendant's arrest, including his threat to kill abortion escorts, "feminazis," or their "sympathizers," this Court declines to assume that his possession of firearms was "solely for lawful sporting or collection purposes," such that a substantial reduction in his offense level is warranted. Next, Defendant assumes that his criminal history category is a II, while the Government suggests that his criminal history could place him in category III. As the probation department has not yet made a determination regarding Defendant's criminal history category, this Court declines to speculate as to what it could be and further finds such a determination to be unnecessary under the present circumstances. Lastly, Defendant's due process argument based on his "minimal" sentencing exposure fails to recognize this Court's authority under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d (2005), to sentence him above the Guidelines range if it finds that such a sentence would be more reasonable and better serve the purposes of sentencing.

With respect to the remaining due process factors, this Court finds that they all weigh heavily in the Government's favor. Given the history of this case, it cannot be said that the majority of the delay in bringing Defendant to trial is attributable to the Government. The record reflects that Defendant was psychologically evaluated to determine his competency to stand trial resulting in a delay from October 2005 to February 2006, a delay which cannot be charged against the Government. See United States v. Dale, 426 F. Supp. 675, 677-78 (S.D.N.Y. 1976) (holding that "delays caused by a defendant's mental inability to stand trial or delays necessitated by a psychiatric

examination required to determine a defendant's competency to stand trial are not to be considered in deciding whether a defendant's right to speedy trial has been abused"). Although the Government is responsible for the two-month delay in transporting Defendant to a facility to be evaluated, the remaining delays are clearly attributable to Defendant's pretrial motions which required briefing, argument, and an evidentiary hearing.

For the reasons previously discussed at length herein, this Court also finds that the charges against Defendant are serious, given the circumstances surrounding his possession of the weapons, and that the evidence supporting his detention is unusually strong. This Court therefore concludes that Defendant's pretrial detention does not, in light of the causes of delay and Defendant's apparent dangerousness, violate due process.

12.   Based on the foregoing, the Government's Motion to Revoke the Magistrate Judge's Order of Release is granted, and Defendant shall remain detained pending resolution of this case. Because this Court finds that no condition or combination of conditions will reasonably assure the safety of certain members of the community, Defendant's alternative request to be released temporarily to the custody of his family to visit his grandmother is also denied.


IT HEREBY IS ORDERED, that the Government's Motion to Revoke Magistrate Judge Schroeder's September 26, 2006 Order Setting Conditions of Release (Docket No. 47) is GRANTED.

FURTHER, that Defendant John J. Mikula shall remain in custody until final disposition of this case.


SO ORDERED.

Dated:  December 5, 2006
        Buffalo, New York

                                                    /s/William M. Skretny
                                                    WILLIAM M. SKRETNY
                                                    United States District Judge